AO-106 (Rev: 06/09)-Application for Search Warrant



# UNITED STATES DISTRICT COURT

### for the

### Northern District of Oklahoma

JAN 0 6 2023

Mark C. McCart, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| In the Matter of the Search of | ) |
| One (1) black iPhone in a black two-piece case with a white sticker on the back bearing the words "918-916-0809 If found, please call 918-420-6243", Currently Stored at ATF offices in Tulsa, Oklahoma | ) ) ) ) ) |

Case No. 23-mJ-12-SH

**FILED UNDER SEAL**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **18 USC § 922(j)** | **Possession of Stolen Firearms** |

The application is based on these facts:

**See Affidavit of Special Agent Sterling Juarez, ATF, attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Special Agent Sterling Juarez, ATF**
*Printed name and title*

Sworn to before me by phone.

Date: __1/6/23__

_____
*Judge's signature*

City and state: __Tulsa, Oklahoma__

**Susan E. Huntsman, U.S. Magistrate Judge**
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| **In the Matter of the Search of** One (1) black iPhone in a black two-piece case with a white sticker on the back bearing the words "918-916-0809 If found, please call 918-420-6243", Currently Stored at ATF offices in Tulsa, Oklahoma | Case No. _____ <br><br> FILED UNDER SEAL |

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Sterling Juarez, being first duly sworn under oath, depose and state:

### Introduction and Agent Background

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I have been so employed since July 2017. I am currently assigned to the ATF's Tulsa, Oklahoma

office.  My primary duties and responsibilities with the ATF are conducting investigations of federal firearms violations and other federal violations.

3. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center as well as the ATF Special Agent Basic Training Academy.  During these courses of study, I received training in the investigation of federal firearm and explosive violations.  I have been a soldier in the National Guard since September 2006, as a Combat Engineer working with U.S., foreign, and improvised explosives.  I have a Bachelor of Science degree in Political Science.  As an ATF Special Agent, I assist in conducting investigations into the unlawful possession of firearms.  Through training, investigations, and experience, I have taken part in cases relating to the trafficking of firearms, the use and possession of firearms by persons prohibited by law, and the possession of illegal firearms.  I am familiar with and have participated in various methods of investigations, including, but not limited to:  electronic surveillance, physical surveillance, interviewing and general questioning of witnesses, use of confidential informants, use of cooperating witnesses, use of toll records, and subscribers information.  I have also debriefed confidential informants and cooperating witnesses regarding the habits and practices of people engaged in the illegal trafficking of firearms.  Furthermore, I have conducted and participated in numerous investigations to include:  crime scene investigations, collection of evidence, interviews, and the execution of search warrants.

2

4. I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

5. Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of a violation Title 18 United States Code, Section 922(j) (Possession of Stolen Firearms) will be located in the electronically stored information described in Attachment B and is recorded on the device described in Attachment A.

**Identification of the Device to be Examined**

6. The property to be searched is a one (1) black iPhone in a black two-piece case with a white sticker on the back bearing the words "918-916-0809 If found, please call 918-420-6243", hereinafter the "Device." The Device is currently located at the Bureau of Alcohol, Tobacco, Firearms and Explosives, Evidence Vault in Tulsa, Oklahoma. The Device is the work cell phone of Joseph Ali BUDDS and is one of two phones seized during the execution of a search warrant at BUDDS' home at

3

1605 E Comanche Ave in McAlester, OK. BUDDS gave consent for ATF agents to search his personal cell phone but not his work cell phone, which belongs to the Department of Defense (DOD). Agents were unsure whether BUDDS could give consent for a government-owned phone and following discussion with Army Criminal Investigations Division (CID) decided to obtain a search warrant out of an abundance of caution.

7. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

### Probable Cause

8. Early on the morning of July 29, 2022, there was a burglary at McAlester Tactical Supply at 601 N Main Street in McAlester, Oklahoma, within the Eastern District of Oklahoma. The business's Federal Firearms License number is 5-73-121-01-5A-04365. Cameras inside the business recorded a white male entering the sales floor from a rear supply closet, stealing an as-yet undetermined number of firearms, and leaving through the same supply closet. Shortly after leaving, a fire started from the same doorway. The ATF provided investigative support at the scene and in the subsequent criminal investigation.

9. During the course of the investigation, ATF set up a tip line and reward. One of calls into the tip line was that a Carl Ray HOLLAND was responsible for the

4

robbery.  HOLLAND has previously been convicted of several felonies and is therefore prohibited from possessing firearms and/or ammunition.

10. On August 1, 2022, ATF personnel located HOLLAND at 517 Adams Avenue, McAlester, Oklahoma, and spoke with him.  HOLLAND gave verbal consent to search the residence.  ATF agents observed multiple firearms in the freezer section of a refrigerator, and detained HOLLAND.

11. ATF agents interviewed HOLLAND, who admitted that the firearms were from the burglary of McAlester Tactical Supply but said that they were "forced on [him]" the day after the burglary.

12. ATF agents also obtained and executed a search warrant for HOLLAND's residence at 517 Adams Avenue on the same date.  During the search warrant, a total of eight (8) firearms were seized.  Of those firearms, all eight (8) were later shown to have come from the burglary of McAlester Tactical Supply based on a review of their serial numbers

13. During his interview, HOLLAND named two (2) individuals, Jerry Lee "JJ" BENJAMIN and Brett WHINERY.  WHINERY and JJ BENJAMIN are brothers and bear a family resemblance to each other.

14. ATF agents interviewed both JJ BENJAMIN and WHINERY on August 3, 2022.

15. WHINERY was arrested after 6:00 pm on July 31, 2022, in Oklahoma City. WHINERY reported to the police in Oklahoma City that, among other things, he had been robbed at gunpoint of his clothes and van by several individuals, some

5

of whom were black.  According to the police report of WHINERY's arrest in

Oklahoma City, he also reported that one of the robbers stated that "...if

[WHINERY] wasn't being honest about what was in [WHINERY's] vehicle he

would kill [WHINERY]."  WHINERY said that he later escaped and was

apprehended by the police.  According to the police report, WHINERY said that his

vehicle was a green Chevy van from the late nineties.

16.  WHINERY also said that he had left the McAlester area to go to

Oklahoma City on either Wednesday or Thursday July 27-28, 2022. When asked

where he had gone to, WHINERY paused for approximately eight (8) seconds, then

said "I'm not trying to lie, I'm just trying to think of a f***ing name."

17.  JJ BENJAMIN declined to directly acknowledge that WHINERY was

involved in the burglary, but, when shown video from inside the business during the

burglary, said "That looks like me."  When asked, JJ BENJAMIN said that it wasn't

him in the video and when asked if it was WHINERY, declined to respond.  Later in

the interview, and not in the context of identifying the individual on video, agents

asked JJ BENJAMIN if he knew where the firearms from the burglary are. JJ

BENJAMIN responded, "My brother wouldn't tell me."

18.  JJ BENJAMIN further said that he had last seen WHINERY on Friday

night, which would have been later on the same day of the burglary.  JJ BENJAMIN

later said that WHINERY told him that WHINERY was going to work on Saturday

July 30, 2022, and JJ BENJAMIN had not seen WHINERY since.  JJ BENJAMIN

was unable to locate the communications he had had with WHINERY and said that

it was possible he had communicated with WHINERY on his wife's phone. JJ BENJAMIN also said that WHINERY had been trying to purchase a green van from a family member in the past.

19. JJ BENJAMIN stated he obtained two (2) firearms from HOLLAND but moved them just prior to ATF contacting him at his residence on August 1, 2022. JJ BENJAMIN stated HOLLAND assured him the guns weren't stolen. JJ BENJAMIN said he bought an SKS rifle for $250.00 and a .380acp caliber pistol. The SKS was moved to his father's workshop and his friend, 'PJ', has the .380acp pistol. He explained that he gave PJ the .380 pistol since WHINERY previously stole a different gun from PJ. JJ BENJAMIN said that he had asked 'PJ' to hold the pistol to avoid trouble on the Sunday July 31, 2022. This was prior to any contact with the ATF, which first occurred on Monday, August 1, 2022. Since HOLLAND is a convicted felon, both firearms were obtained illegally.

20. JJ BENJAMIN additionally gave a different account of WHINERY's arrest in Oklahoma City, which JJ BENJAMIN said he had heard from JJ BENJAMIN and WHINERY's mother.

21. ATF agents contacted Michele BENJAMIN, the mother of both JJ BENJAMIN and WHINERY. Michele BENJAMIN said that she had spoken to WHINERY on either Sunday, July 31, 2022, or Monday, August 1, 2022, following his arrest. Michele BENJAMIN said that WHINERY had told her that he had been robbed of drugs by members of the Aryan Brotherhood in Oklahoma City. This is the same version of events related to ATF agents by JJ BENJAMIN in his interview.

7

22. ATF Agents obtained the jail call WHINERY made to Michele BENJAMIN at phone number (918) 470-4755 from the Oklahoma County Jail on August 1, 2022. He stated on Sunday, July 31, 2022, he was held at gun point, then robbed and pistol whipped. He explained that they stole everything, including his van. Michele BENJAMIN said "Okay, good. Who done that?" WHINERY replied, "...this f***ing dude I met. I was trying to get money all day yesterday...he was just playing me around... I didn't have no gas to get home... so I was just... you know what I mean? ... ended up getting f***ing robbed. He had two people holding me up at gunpoint, in the house, butt a** naked. He was out there robbing my van, trying to find... and it had some stuff hidden... He come back and said 'Where's the stuff?' I said man it's in the f***ing side panels... He was like 'tell me where it's f***in at.' And I was like man I just f***in' did. And he f***in' pistol whipped me in my head... gashed the f**k out of my head, blood everywhere... Anyways, he was like 'If I find something that you didn't tell me about, I'm f***ing killing you.' So he went back out there and started looking in my van some more so I got f***in nervous so I f***in, first chance I got, I f***in ran. I uh,... took the stick out the back door, took off running..." He then told Michele BENJAMIN that he gave the police a fake name. He jumped out of the ambulance and hid in the trash can for a couple of hours. He went to get out so he could call someone and go home but the police were waiting right by the trash can. Michele BENJAMIN asked WHINERY if she needed to have "Nicole" report that the van was stolen. He stated, "no, they don't

8

know it's stolen... I would leave that alone." Michele BENJAMIN replied "Okay, alright."

23. On August 6, 2022, ATF received an anonymous tip on the tip line that on July 30, 2022, the tipster was at William 'Bill' BENJAMIN's residence located at 1752 Blackberry Road, Indianola, OK 74442 from approximately 1900 to 0200 hours on July 31, 2022. Bill BENJAMIN is the stepfather of WHINERY and married to Michele BENJAMIN. During the course of the night, Bill BENJAMIN and the tipster were in Bill BENJAMIN's workshop alone. Bill BENJAMIN told the tipster that his stepson, WHINERY, conducted the burglary at McAlester Tactical Supply. After conducting the burglary, WHINERY called his brother, JJ BENJAMIN, to pick him up from the burglary location. Bill BENJAMIN further explained that JJ BENJAMIN picked WHINERY up and came to Bill BENJAMIN's residence located at 1752 Blackberry Road. Bill BENJAMIN was awoken by the brothers' arrival. Bill BENJAMIN stated that he saw approximately fifty (50) firearms and told them to "get that shit out of here." JJ BENJAMIN and WHINERY left the residence with the firearms. Bill BENJAMIN stated there were all different types of firearms and said there was "a shit ton of them." Bill BENJAMIN was visibly upset when discussing this with the tipster. Michele BENJAMIN came out to the workshop and asked what they were discussing. The tipster deflected the question and Michele BENJAMIN left the workshop.

24. The tipster also saw JJ BENJAMIN at the address on this same night briefly coming from the camper trailer. JJ BENJAMIN spoke briefly with the tipster.

9

25. The tipster confirmed there are surveillance cameras at the residence.  Bill BENJAMIN told the tipster he was upset because he had to go back and erase the video showing JJ BENJAMIN and WHINERY coming to the residence after the burglary with the stolen firearms.  The tipster was confident that Michele BENJAMIN told Bill BENJAMIN to erase the video.

26. WHINERY is a convicted felon having been convicted of Possession of a Firearm After Former Felony Conviction in Pittsburgh County Case CF-16-278 and Embezzlement in Rogers County Case CF-15-739.  Therefore, he is not permitted to possess firearms and/or ammunition.

27. On August 31, 2022, an ATF Agent received a tip from Confidential Source 1 (CS-1) stating firearms stolen from McAlester Tactical Supply were located at a residence belonging to "Joe" on E. Comanche in McAlester, OK. Agents called and spoke to CS-1 who stated on August 30, 2022, they saw a male come to the house in an older, green van. The male then unloaded several heavy looking bags from the van and carried them into the house. The male did not return with anything from the house to the van. CS-1 also stated there were surveillance cameras at the residence. Agents sent CS-1 a screenshot of the front of 1605 E. Comanche Avenue, McAlester, OK, which was taken from Google Maps. CS-1 replied with a thumb's up reaction on the messaging application. Agents called CS-1 back and asked if they were confirming that the photo was in fact the house that they saw the green van and where WHINERY stated the firearms were hidden at. CS-1 stated it was the correct house. CS-1 told Agents they heard WHINERY state the firearms were located at

10

1605 E. Comanche Ave., either under the porch or in the basement, and that Joe

BUDDS lives there. CS-1 told Agents they had previously seen the same green van

several times at Jeremiah Smith's house on A Street, which is directly across the

railroad tracks behind McAlester Tactical Supply. Agents had previously interviewed

Jeramiah Smith, who confirmed WHINERY had been at his house in the past. It

should be noted that WHINERY mentioned a van as noted previously in this

affidavit. JJ BENJAMIN also told Agents WHINERY was in possession of a green

van.

28. On August 31, 2022, ATF Agents received an anonymous tip on the tip

line stating they had information about the person who committed the McAlester

Tactical Supply burglary on July 29, 2022, and the possible whereabouts of some of

the guns stolen from there. ATF agents called the number left by the tipster and

spoke to Confidential Source 2 (CS-2). CS-2 stated that WHINERY approached

them for a ride on August 30, 2022. WHINERY proceeded to ask CS-2 if they were

interested in robbing Joe BUDDS of the guns WHINERY had sold him previously

to then make some money. CS-2 declined to participate, but asked what guns they

were, and WHINERY stated they were from the burglary in town. WHINERY

advised CS-2 the guns were in the garage or underneath the house. CS-2 verbally

confirmed that Joe BUDDS lives at this residence by viewing a screenshot sent from

Agents of the front of 1605 E. Comanche Avenue, McAlester, OK 74501 obtained

from Google Maps. This was the same screenshot shown to and identified by CS-1

as Joe BUDDS' house. Agents asked CS-2 about WHINERY and the green van. CS-

11

2 confirmed a family member of WHINERY's owns a green van. JJ BENJAMIN
stated in an interview with investigators that WHINERY was trying to purchase a
van from his cousin. CS-2 stated WHINERY has a cousin, who is more like a sister,
named Nicole King who does have a green van registered to her. As mentioned
above, WHINERY mentioned a 'Nicole' to Michele BENJAMIN in regard to not
reporting the green van stolen after he was arrested in Oklahoma City. CS-2 was very
confident that the person seen on the surveillance video was WHINERY, as he was
wearing the same clothing on August 30, 2022 as seen in the video released to the
public, specifically the shirt and hat. CS-2 pointed out a distinct characteristic on
WHINERY's hoody they noticed that day and it could only be seen in certain
lighting on the surveillance video from the burglary. Agents looked back at the video
and corroborated this distinction. CS-2 also stated WHINERY was wearing the same
camouflage hat on August 30, 2022 that was seen in the video and that he wears it all
of the time. CS-2 stated Joe BUDDS is known to do shady stuff and he wouldn't be
against doing something that wasn't right.

29. On September 1, 2022, ATF agents served a federal search warrant at 1605
E Comanche Ave, the residence of Joseph Ali BUDDS, for—among other things—
firearms. In a mirandized custodial interview simultaneous to the search, BUDDS
acknowledged having purchased five (5) firearms from Brett WHINERY for eight-
hundred dollars ($800) on July 29, 2022. BUDDS showed agents on his phone a
withdrawal from his bank account on the same date for nine-hundred dollars ($900).
said that he had subsequently heard about the burglary and fire from a friend,

deduced that the firearms were from the burglary, and stashed them in the trunk of a car at his friend's house. BUDDS lead agents to the house, where the owner gave verbal consent over the phone for the agents to recover the firearms. Agents recovered five (5) firearms and one (1) suppressor from the trunk of the car and shop where the car was parked. Serial numbers from all of the firearms and the suppressor matched serial numbers of items stolen from McAlester Tactical Supply.

30. An interstate nexus determination report prepared by SA Sterling Juarez showed that all five (5) of the firearms which BUDDS led the ATF to had travelled in or affected interstate or foreign commerce.

31. Without having referenced his phone, and without mentioning the address, BUDDS described the property where he had gone on July 29, 2022 to look at firearms WHINERY was offering to sell him. BUDDS said he went to the house, saw approximately ten (10) firearms leaned up against the wall and/or laying on the floor, picked out the five he wanted to buy, withdrew money from the bank, and returned to purchase the five firearms he had picked out for eight-hundred dollars ($800). BUDDS' description of the house allowed agents to find the property on Google Maps at BUDDS' direction. BUDDS further identified the front of the house in Google Streetview. The address of the house identified by BUDDS on Google Maps in his interview was 305 E Fillmore Ave, McAlester, OK. BUDDS additionally gave consent for ATF agents to search his personal cell phone but not his work cell phone, which belongs to the Department of Defense (DOD). Agents were unsure whether BUDDS could give consent for a government-owned phone

and following discussion with Army Criminal Investigations Division (CID) decided to obtain a search warrant out of an abundance of caution. In reviewing BUDDS' personal cell phone after BUDDS' interview, agents observed a text conversation with a number not saved in the phone's contacts, but previously identified to agents as WHINERY's number. On July 29, 2022, text messages from this phone number gave the following address to BUDDS: "305 e Filmore McAlester ok 74501" [sic]. A message following the address reads in part: "I'm leaving for a couple of days to get away I'll let u know before I leave tho". WHINERY was arrested in Oklahoma City the following Sunday July 31, 2022.

32. Based on the foregoing, I believe there is probable cause that the DOD cell phone described and seized from BUDDS will contain information related to the possession of illegal firearms by a prior convicted felon and possession of stolen firearms. The phone may also contain information showing the involvement of Jerry Lee 'JJ' BENJAMIN, Brett WHINERY, Carl HOLLAND, and other as-yet unidentified individuals.

33. The Device is currently in the lawful possession of the ATF. It was seized pursuant to a federal search warrant at Joseph BUDDS' residence at 1605 E Comanche Avenue, McAlester, Oklahoma 74501. I secured the Device and transported it to the ATF offices in Tulsa, which is within the Northern District of Oklahoma.

34. The Device is currently in storage at the ATF offices in Tulsa, Oklahoma. In my training and experience, I know that the Device has been stored in a manner

in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the ATF.

### Technical Terms

35. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

15

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where

16

it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer

17

software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the

Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term— IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

36. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, as a GPS navigation device, PDA and Tablet, with an IP Address and can access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

19

38. I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities, including drug and firearm trafficking. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

39. I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications. Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug and firearms trafficking.

40. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

41. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to

21

draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

18. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is

reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

19. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the Device. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

## Conclusion

20. Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

21. I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Sterling Juarez, Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Subscribed and sworn to me by phone on January 6, 2023.

SUSAN HUNTSMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

The property to be searched is one (1) black iPhone in a black two-piece case with a white sticker on the back bearing the words "918-916-0809 If found, please call 918-420-6243" (the Device). The Device is the phone which BUDDS identified as his work phone, belonging to the Department of Defense, at the time of the search warrant at his residence and custodial, mirandized, recorded interview with ATF agents. The Device is currently located at the Bureau of Alcohol, Tobacco, Firearms and Explosives, Evidence Vault in Tulsa, Oklahoma.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

Photos of the Device are attached:





## ATTACHMENT B

### Particular Things to be Seized

All records on the Device described in Attachment A that relate to violations of any criminal acts constituting violation(s) of:

- Title 18, United States Code, Section 922(i), Possession of Stolen Firearms

1. Records relating to communication with others as to the criminal offense listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

2. Records relating to documentation or memorialization of the criminal offense listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

3. Records relating to the planning and execution of the criminal offense above, including Internet activity, firewall logs, caches, browser history, and cookies,

"bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

4. Application data relating to the criminal offense listed above;

5. Threatening communications related to the criminal offense listed above;

6. All records to include bank records, checks, credit card bills, account information, and other financial records, electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting straw purchases, real estate transaction documents, rental agreements or documents related to the purchase, sale, transfer, or storage of firearms.

7. Evidence of user attribution showing who used the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

8. All records and information related to the geolocation of the Device and travel in furtherance of the criminal offense(s) listed above; and

9. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above.

4

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

5